**In re RICHARDSON GROUP, INC., Debtor.**

**Bankruptcy No. 89–2768–8P1.**

United States Bankruptcy Court, M.D. Florida, Tampa Division.

Oct. 18, 1989.

R. John Cole, Sarasota, Fla., for Richardson Group Inc., Debtor.

David J. Tipton, Bradenton, Fla., for FDIC.

ALEXANDER L. PASKAY, Chief Judge.

ORDER ON FEDERAL DEPOSIT INSURANCE CORPORATION'S MOTION FOR RELIEF FROM AUTOMATIC STAY, ALTERNATIVE MOTION FOR ADEQUATE PROTECTION, MOTION FOR SEQUESTRATION OF RENTS AND PROFITS and MOTION TO PROHIBIT DEBTOR'S USE OF CASH COLLATERAL

THIS is a Chapter 11 case and the matters under consideration are several Motions filed by the Federal Deposit Insurance Corporation (FDIC): 1) Motion for Relief from Automatic Stay; 2) Alternative Motion for Adequate Protection; 3) Motion for Sequestration of Rents and Profits;

and, 4) Motion to Prohibit Debtor's Use of Cash Collateral. The relief sought by the FDIC is based on the contention that there is no equity in the properties owned by this Debtor and the properties are not needed for an effective reorganization based on § 362(d)(2) of the Bankruptcy Code. In addition, the FDIC also seeks relief from the automatic stay pursuant to § 362(d)(1) for "cause" based on the allegation that the FDIC lacks adequate protection. In light of the fact that the parties agreed that the Debtor has no equity in the properties involved, this Court scheduled a final evidentiary hearing on the limited issue of whether or not the properties owned by the Debtors are, in fact, needed for an effective reorganization.

The facts as established at the evidentiary hearing, together with the facts as they appear from the record which are relevant, are as follows:

Richardson Group, Inc., is a Florida corporation and the owner and operator of two office buildings located in the city of Sarasota, Florida. One of the properties referred to is located at 1266 First Street and is an office building on which currently there is due and owing to the FDIC, the holder of a first mortgage:

| | | |
|---|---|---|
| 1) Principal | | $676,205.37 |
| 2) Interest at Note rate * 1 (variable) from 10/01/86 through 2/16/89 (date foreclosure complaint served on Debtor) | | 161,935.20 |
| 3) Interest at Note default rate (25%) from 2/16/89 through above date (per diem after above date = $463.15) | | 76,419.75 |
| | SUBTOTAL | $914,560.32 |

| OTHER EXPENSES | | |
|---|---|---|
| 1) UCC Search Expenses | | 28.75 |
| 2) Title Search Expenses | | 185.00 |
| 3) Attorneys' Fees Incurred | | 800.00 |
| | TOTAL | $915,574.07 |

The only other property owned by this corporation is the property located at 205 North Orange Avenue:

| | |
|---|---|
| 1) Principal | $759,853.10. |

The property on 1266 First Street currently has a 100% occupancy and the property on 205 North Orange is at 70% occupancy. It is conceded by the Debtor that neither of the properties generated sufficient income in the past, nor do they at present service the mortgage debt after meeting the operating expenses of the two buildings. The fact of the matter is that it is conceded that the president of the corporation, who is the sole stockholder of the Debtor had to infuse $100,000 of his own funds in the years 1987 and $150,000 in 1988 in order to maintain these properties. It is also conceded that Southeast Bank holds a second mortgage covering both properties in which there is a current balance of $629,000.00. The Debtor contends however, that Southeast will release its mortgage on the properties based on the Debtor's good personal financial history. It should be noted, however, that no representative of Southeast Bank was present at the hearing and that no evidence was presented to support this contention. According to the testimony of the president of the Debtor, the market in Sarasota for office buildings is saturated and is very soft and will remain soft for the next two to five years. The Debtor will default again on the mortgages. The potential viability of these properties is based on the contention that if given time, hopefully the Debtor will be able to increase the rent to $15 per square foot. This proposition is clearly contradicted by the testimony of the president of the Debtor himself, who indicated, as noted earlier, that the market will remain soft for the next two to five years during which time the current rent is $10 per square foot. Thus, clearly, there will be a steady shortfall every year or at least during the majority of the remaining years of these two mortgages, both of which will mature on January 3, 1995. To service the mortgage covering the building at 1266 First Street, which generates a gross income at this time of 100% occupancy, there is testimony that it requires approximately $2,000 a month to meet the operating expenses of this building, thus leaving a net

---

1. * Under the terms of the notes, the interest rates were as follows for the following years:
   1985 = 13.5%
   1986 = 9.5%
   1987 = 8.875%
   1988 = 8.875%
   1989 = 11.89%

income of approximately $5,424.75 representing an operating shortfall of approximately in excess of $1,465.79, or approximately $17,500 a year on this building alone. To further illustrate this dismal picture, the Debtor will need to generate $9,187.38 each month to pay the current contractual obligation, not a default rate and to pay the past due interest which has accrued since November 7, 1987. As to the mortgage on the building at 205 North Orange Avenue, the testimony indicated that at a 70% occupancy rate, the gross income is $5,877.41 with $2,000.00 expenses, which equals $3,877.41, representing a monthly shortfall of $3,865.53 or $46,386.36 annually.

At the time the Debtor filed its Petition for Relief under Chapter 11, the properties already were involved in a foreclosure and the Petition was filed two days before a scheduled hearing on a Motion for Summary Judgment in the foreclosure action.

The schedule filed by this Debtor indicates that this controversy is basically a two-party dispute. Excluding the insiders, the total unsecured obligations of this Debtor and excluding current ongoing bills such as bills for utilities and telephone service are less than $15,000. In spite of this overwhelming evidence, it is the Debtor's contention that it should be permitted to attempt to achieve reorganization, *citing, In re Grand Sports, Inc.*, 86 B.R. 971 (N.D. Ind.1988).

It is ironic indeed that in that case the Motion to Lift the Stay was granted, but the Debtor relies on some general language in that case to the effect that it should be given at least one opportunity to obtain confirmation of its Plan of Reorganization. Generally speaking, this Court is inclined to follow the approach taken by *Grand Sports*. However, this Court is satisfied that while the Debtor may be able to obtain the necessary vote of the class of unsecured creditors, it is very doubtful that the FDIC will ever vote for this Plan. Counsel for the Debtor indicated that he may attempt to use the cramdown provision of § 1129(b) in the event he is unable to get the affirmative vote from the FDIC

forgetting, however, that if he is successful, the FDIC will be the largest unsecured creditor who would effectively control the vote in the unsecured class.

The President of the Debtor indicates that he is willing to put in $100,000 personal funds to meet the current shortfall and continue to make the adequate protection payments to infuse an additional $100,000 during the year 1990. As to the source of these funds, it is indicated that he hopes to be able to sell one of his properties. There is no evidence presented that he has a contract or will have a contract in the near future. As a back-up proposition, the President of the Debtor indicated that he has an interest in real estate close to $10,000,000 which, if necessary, could be used as collateral for refinancing the property and from the refinancing to secure the funds necessary to meet the shortfall of the income derived from these two buildings, an event which will no doubt occur. When queried by the Court as to why on earth he is going to keep on putting all these funds into these two buildings which appear to be lacking total economic viability, he indicated that he wants to maintain his reputation and integrity as a real estate developer in the community and to escape the stigma of having lost a property through foreclosure. While this certainly could be a laudable goal in a vacuum, it certainly is not the basis to maintain a corporate cripple under the shield and protection of the bankruptcy court. *In re Southwest Enterprises, Inc.*, 261 F.Supp. 721 (W.D.Ark. 1967). The logic of this proposition is hardly apparent when one considers the fact that these properties already are in foreclosure. It is odd indeed that the fact that the Debtor sought refuge in the bankruptcy court is not deemed to have a negative impact on his reputation. In addition, it is a well-settled rule that the purpose of reorganization is to prevent a sinking corporation from drowning, but it was not the purpose of Congress to place crutches under corporate cripples. See also *In re Breeding Motor Freight Lines, Inc.*, 172 F.2d 416 (10th Cir.1949), where the court stated that despite the debtor's sincerity, the court was not required to retain on its

docket a proceeding for reorganization which is nothing more than a visionary or economically an impractical scheme.

It is clear that the sole purpose of this Chapter 11 case is to prevent the loss of these properties through foreclosure, this is hardly a justification to permit this debtor to languish in the bankruptcy court any longer, hoping without basis that Judgment Day will never come. *In re Albany Partners*, 749 F.2d 670 (11th Cir.1984).

Based on the foregoing, this Court is satisfied that more than ample evidence in this record indicates that the Debtor has no equity in the two properties and they are not needed for effective reorganization. For the reasons stated, therefore, it is

ORDERED, ADJUDGED AND DECREED that the Motion for Relief from Stay be, and the same is hereby, granted and the automatic stay be, and the same is hereby, lifted, and FDIC be, and the same is hereby, authorized to go ahead with the foreclosure action necessary.

DONE AND ORDERED.